We will take up Emeritus Life Insurance v. Wilmington Trust. Good morning. May it please the Court. Greg Starr on behalf of Emeritus Life Insurance Company. This is a unique case, and before I get into why this is truly a case of first impression, I'd like to talk a moment about what this case is not about. This is not a normal run-of-the-mill insurance dispute. This is not a coverage dispute. This is not a case between a life insurance company and the insured or a family member of the insured. This is not a situation where the insured passed away or somebody submitted a claim and a claim has been denied. This is a much different case. This is one of first impression. The question here is whether a third party investor who has absolutely no insurable interest, no other interest whatsoever in the life of the original insured person, whether after they lawfully buy an existing term life insurance policy from that insured, whether that third party that has absolutely no insurable interest in the life of the insured can then exercise a conversion privilege in the original contract, creating a brand new contract 20 years after the original contract was created. Let me ask you this. I'm a little unusual on the Ninth Circuit. I was a transactions lawyer for about 37 years. I've drafted lots and lots and lots of contracts, and this is a really badly drafted contract. Company drafted it. They drafted it. I doubt you will dispute that if Mr. Mogadom had simply converted the policy, we wouldn't be here. That's correct. What we've got now is we have a contract that contains integration clauses, all kinds of definitions that simply don't fit. Your company drafted that contract under standard law. Who bears the fault in a commercial situation like this for the misdrafting? It's your company, isn't it? Well, I think, I'm glad you asked this question because it goes to an issue that I was hoping we would address. The issue here is that of insurable interest. Let me step back. The original policy in 2004 and the 2020- Wait, wait, wait, wait, wait. Before you get to insurable interest, that's the boogeyman in this, of course. But the reality is what we're really talking about is this contract is filled with terms that under certain circumstances fit just fine. But you all apparently did not contemplate the situation here, and now you're trying to get out of it. The question I have is since you were the draftspeople that created the problem in the first place, why do you not get penalized for the poor draftsmanship? Because this is a situation where the contract at inception back in 2004 said nothing about this issue of insurable interest on any topic in the contract. This is not the normal run-of-the-mill insurance dispute where an ambiguity, if there were one, and we don't think there is any, would be construed against the insurance company. And this is because the contracts, the first one, the second one, neither of them speak to the issue, whether in the conversion privilege or anyplace else. Neither of those policies ever say that a person taking out the policy or converting the policy or serving as the owner or serving as the beneficiary, owner and beneficiary being defined terms in both of the two different contracts. Neither of them say that that person or entity has to have insurable interest, and this is very important reason why. Wait a second. The first, the term policy expressly says, has a provision that says it can be converted without an insurable interest existing. Expressly says that. No, I... It's the conversion provision in the first term policy. The language is different than that, Your Honor. It says without evidence of insurability. Insurability in the industry is, it's not a defined term in the contract. I did insurance law, too, just so you know.  Insurability... You have to have a good expert in that area. Insurability then generally is referring to evidence of health, right? They're not going to medically underwrite this person again if he chooses to convert the policy. That's the whole point of a conversion privilege. So if Mr. Mahogany wanted to convert the policy 18, 19 years later because he had a change in health and wanted now to have a permanent policy that he could count on later on, he could do that without having to go under medical underwriting again and perhaps face a situation where depending on what his condition had been, he either was not insurable because of medical conditions or his rates would have gone up too high. But the policy, Your Honor, says nothing about the concept of insurable interest. And the reason for that is because insurable interest is not a matter of contract. It's not a matter of contract interpretation. Insurable interest is a matter of law. It's a matter of statute in both California and Delaware. And it's a matter of public policy. Counsel, you're raising this as the great boogeyman in the sky, a human wagering. We all get that. But both Delaware and California would have permitted this issue had it been properly drafted. My problem, and you're going to have to at least convince me that the contract that you drafted here is going to give you any kind of relief because your language is contradictory within the policy and to the degree that it is ambiguous and creates problems. You drafted it. And under well-known presumption, you bear the burden of that negotiator, do you not? Well, our position is the language of the contract does not control over the insurable interest statutes. The contract, again, in the conversion provision says nothing about insurable interest. The contracts as a whole say nothing about insurable interest. This is not a question, respectfully, in our view. This is not a question about interpreting the contract as much as it's a question about what's proper and what's permissible under the insurable interest statutes. As an example, the insurance company couldn't say I will issue a policy to anybody who wants to take it out, whether they have insurable interest or not. That would be illegal under California and Delaware law. If the insurance company said that in a contract, it would be irrelevant. These form contracts, by the way, are all, of course, forms that had been approved by the state insurance commissioners. These terms are relatively standard. I'm not familiar. I've looked at a lot of life insurance policies of any policy that ever comes out and defines when or who must have an insurable interest or what that means. And the reason for that is because that is a matter of the plain language of the statutes. The insurable interest issue is simply the boogeyman sitting at the end of the table, is from my perspective. Before you get to that, you have to find out what was intended, what the contract provides in the event that the policy is sold, which is what happened here. And in my judgment, what happened when it was sold was you got an absolute hodgepodge, mishmash of contradictory language, which could lead to various results. Now, of course, it doesn't change what's insurable and what's not. That's a matter of statute, as you've made clear. But I don't see how you can construe your contract, your life insurance contract in a way that says, oh, we're the good guys because, you know, we don't want anybody to be wagering against a human life. That's almost an irrelevant question in my mind. The question is, what does the contract do under the circumstances? And I don't think your people took that into account. And I think it's screwed up. And because it is. Tell me why you should not bear the burden of that problem. Well, I agree with you, Your Honor, that these insurance companies, my company, my client, Emeritus, and others who have very similar language like this in policies that have been out there on the lives of people for many years, did not contemplate this scenario. This is a case of first impression. There was no contemplation in the life insurance market 20 years ago that there would become this so-called life settlement industry where investors would purchase policies. An investor can always have purchased the policy that existed and keep that policy. It's a fungible asset. If you took out a policy lawfully with insurable interest in your own life to begin with, you've been allowed to sell that policy for many, many years. So if the insured had converted the policy from the term policy to the permanent policy and then sold it, would there be a problem? It would not be a problem. He could have done that. And in there lies one of the, I think, underlying myths of what's going on here. It was suggested by the district court that Mr. Mahogany's reasonable expectations should be considered. The entire discussion about that by the district court was based on facts that don't exist in the record. They certainly weren't in our complaint. But the district court seemed to infer, I don't know from what, that Mr. Mahogany must have intended to sell this conversion right. And that's really what he was selling. We have no idea about that. I think what really happened and what discovery would probably bear out is that Mr. Mahogany was paid very little for a policy, a term policy whose 20 year term was about to expire, where the premium payments were about to quadruple, they were going to balloon. I think he got probably, discovery would show that he got paid very little for a policy like that. He had no idea, I would think discovery will show, that the investor was going to turn around and convert this policy into something that is absolutely brand new for a lot of different reasons. Not only was it issued with an issue date 20 years after the first policy, but it had a policy date 20 years afterwards. That's important. There's nothing in the term policy that prevented that. That prevented what? That prevented what happened in this case. The term? No. Which was, whoever bought the term policy, maybe for less than it was worth, I don't know, but it contained a right to convert. And so within the entire purchase was that right, the bundle of rights in that policy. So what in that policy says you can't purchase it, you can't sell it and not include the right to convert when it's there in the policy? You're right about that. There's no language in the policy that says that. And that's why I come back to, the policy doesn't say one way or the other. That's why this is a case that's truly based on the plain language of the insurable interest statute. Don't we have to figure out if the new policy, it's referred to as the new policy in several provisions in the agreements, is indeed a new and different insurance policy with an effective date sometime in 2023, or whether it's simply a conversion and a continuation of the previous policy that had an effective date in 2004. Because at the effective date, we have to have an insurable interest. The insured could take a policy on his own life. He had an insured interest in 2004. The purchasing company Wilmington did not have an insurable interest in 2023. So what is there in the statutes or the contracts that would help us decide what is the effective date of this statute? Thank you for that. Excuse me, of this policy. Of this policy. So thank you for that. Besides the difference in dates, there are at least four materially different, more advantageous provisions in the 2024 policy that did not exist in the original term policy. And this is at the record at page 94. The new policy issued in 2024 would allow Wilmington Trust to change the death benefit option on the policy. They could have a flat death benefit of the $3.7 million, or they could change it to one of two other options. That's not something that existed under the original policy. It was a set flat death benefit. The second is at page 94 to 95 of the record, and this is very important. After owning the new policy for one year, Wilmington Trust would ostensibly have the right to increase the coverage above $3.7 million. There's a provision called changes in the specified amount that's talking about the $3.7 million specified face amount of the policy. They did not have that ability under the old policy. So what you're pointing to are differences in coverage within the provisions in the permanent policy. What I'm asking is whether there is anything in, I'm just going to assume it's California law, but it could be California or Delaware law, that would tell us how to define the effective date. And if there is not, you have said several times this is an issue of first impression. Should this be certified to the California Supreme Court or the Delaware Supreme Court? Well, I think the effective date is not in dispute, and I don't think it's ambiguous. For example, if you look at California's insurable interest statute, it speaks to needing an insurable interest at the time you apply for a policy. Needing an insurable interest at the time the policy becomes effective. These policies have distinct policy dates and issue dates. The issue date of the 2024 policy is defined by that policy, is the date that coverage becomes effective under that policy. Just to be clear, there's no dispute here that there's been a continuity of life insurance coverage on Mr. Mahogany's life going back to 2004. But what's happened is that coverage has happened under two separate contracts. This is really no different than if you leased an apartment or you leased a home from somebody for 20 years under a rental agreement. And then 20 years later, you said, you know what, I'd like to purchase the home from you. You continually occupy the home for all of those years. But you've done it under two separate contracts, and that's what's going on here. And that's really the question. If this is a separate contract, which we believe it is, it's under Delaware law, it's not under California law. It's got a brand new contracted party, Wilmington Trust. It has all of these other material terms that are different. And it has an integration clause, as did the first policy. The term policy did as well, right? And from my perspective, you've got this problem. You've got an integration clause. You've got the old contract and the new contract. I don't see how there's a continuity here. You've got a whole new deal. I agree, yes. That's fine. That's fine, but it has nothing to do with the purchase, sir. This was a company decision. And for what it's worth, the industry that we speak of was flourishing handsomely in Beverly Hills for at least 30 years, and probably continues so to this day. This is, if you will, an industry-wide play. Some people get involved in it. Some people don't, in my judgment, in this particular case. The contract was drafted in such a way that it is internally inconsistent. And when you have that problem, then we have to decide what to do with it. Does that mean your client gets the benefit, i.e., that there is no policy because of the human wagering? Or does your client get penalized because it didn't do the contract properly? Well, I want to be clear about one thing. We've said this in our complaint and in our papers. We're not looking to say to Wilmington Trust that it's out of luck, that it has no policy. What we've said is, we think the new 2024 policy is void. And we will reinstate the original term policy. And we'll do it with, we'll work with them to do it. There'll probably be some refund- Wait, wait, wait. Oh, again, you're saying that you're basically saying to the now owner of the policy, we're willing to go back and reinstate what was there before Mr. Medosian, or however you say his name, sold this to you and the port was converted? Is that correct? That's correct. Our complaint's clear on this. We will reinstate the term policy that they purchased from Mr. Mahogany. They'll have the term covered. And you're doing this as a way of settling this? Or certainly not the normal run-of-the-mill insurance practice, is it? No, the reason we're doing it, Your Honor, is because the sale from Mr. Mahogany to Wilmington Trust of that original policy was valid. No one contests that. We filed a declaratory judgment action here asking for clarification on two things. Whether, under California law that applied to the 2004 policy, we were required to honor the application to change and convert the policy. Secondly, because the new policy is a Delaware policy, issued and delivered in Delaware, applied for on Delaware illustrations, et cetera, whether under Delaware law, which controls the new policy, the new policy is valid or should be voided. But we've been clear all along that if the court comes out in our favor on either of those questions, we reinstate the original term policy. They're not without a policy. Are you asking the court to basically kick this over into a mediation between you and your adversary? No, we're asking for a decision on the law, Your Honor. We're asking for, as a matter of the plain language of the insurable interest statutes, which everybody here, I think, agrees would prevent Wilmington Trust from creating a new policy today on Mr. Mahogany's life for their own benefit, whether they could do that same thing simply through what I think is a loophole of this conversion privilege. Well, what I think is that you haven't addressed the Supreme Court standard for determining whether the conversion clause is the same policy, and that was in Aetna Life Insurance versus Duncan, and that's what the district court relied upon, which says the second policy was issued in pursuance of and was dependent for its existence in terms upon the express provisions of the contract contained in the first one. Why isn't that the situation we have here? Several points, Your Honor. Number one, that's pre-eerie federal common law that's not been adopted in California. It's not been adopted in Delaware. Adopted by the Supreme Court of the United States. As pre-eerie common law. On a different set of facts, the question presented there was whether the life insurance company, having originally issued a policy to an insurer who lived in Tennessee, and then moved to Texas and converted himself, his policy in Texas, whether the insurance company would then be subject to a Texas statute that would penalize the insurance company for late payment, incur attorney's fees and other costs. They never dealt with the question that we have of whether a third party can convert the policy, whether that makes a new contract. The Aetna case really is not on point. We've said other cases like the Gans case, where courts have gone the other way. But the main difference here is that every one of those cases, Aetna included, has involved the original policyholder, the insured, who then converted the policy, and the case was, I see I'm running out of time, but the case was then about truly whether there was coverage or some liability from the insurance company to the insured person who was the policyholder throughout. I know you're over time, but I would like to finish the question I was beginning to ask you earlier, which is about the integration. There's an integration clause in the permanent policy, and it lists things that are included within the policy. One of the things it lists is the application. What application is that referring to? It's the conversion application, the application for the new policy. It's very important. The integration clause from the 2024 contract does not include the original policy, but it does include the application submitted to Emeritus in 2023, which asked us affirmatively to, quote, cancel the old policy, and in lieu of that, issue a, quote, new policy, which is what we did subject to a reservation of rights and us coming here to get clarification on what was required, what is required. Thank you.  Sorry. Good morning, Your Honors. May it please the Court. My name is Kai LeQuang, and I represent Wilmington Trust National Association of Securities and Community. I want to address a couple factual issues first. It's clear from the record that Mr. Mogadom participated in the procurement of the conversion. Excerpts of Record 64, he signed the application for conversion, so he was well aware of it when Wilmington Trust was actually converting the policy and very much likely knew that Wilmington Trust was purchasing the policy. So why is that significant? Because the conversion happened after Wilmington Trust owned the policy, correct? Yes. In some respects, I would say the insurable interest issue is not an issue at all because Mr. Mogadom himself was part of the procurement of the application. But he didn't own the policy, so how could he have been part of the procurement? The main reason I raise this, one, is just to correct the record because somebody, I think, had indicated that Mr. Mogadom was not aware of it. But second, it's really not about insurable interest because the term STOLI and Stranger Originated Life Insurance was bandied about in briefs. And I'll cut to the issues. I just wanted to clarify. You would agree that if Wilmington Trust had attempted to take out a policy on Mr. Mogadom, I think is what we go by, on his life, they wouldn't be able to do that? I would agree with that 100%. But what I would disagree with is that they are taking out a new policy on his life as if this is not really just a conversion of a term policy into another form of life insurance. Your company, Wilmington Trust, is not a naive or small player, right? This is a sophisticated entity that likely takes these risks frequently, purchases a term life insurance policy from someone for whom it's essentially worthless because they're about to age out and they may not be insurable. They may not be able to get another policy. And even if they can, they can't afford the premiums. So you take the risks that a 66-year-old may not live a long time and you may not have to pay as much in premiums as you're going to obtain from the payout, which is fine. That seems to be legal. But it doesn't make Wilmington Trust somebody who's been hoodwinked or taken advantage of this as a sophisticated entity coming into this transaction. So when I read this, I thought, why on earth did they just not have the insured convert the policy before they purchased it? The whole problem could have been obviated. I think that is true, but I don't think it matters. And I think one can absolutely look at the contract itself to see this. Nothing in the contract suggests that there is an insurable interest requirement or that the owner can't exercise. Well, that's the law, right? It's the law in Delaware and California. It's not new, this notion that you can't take a wager. You can't bet on somebody's life. But that's public policy. That's not something that Wilmington Trust was unaware of. You were fully aware of that. Wilmington Trust, on behalf of an investor, was fully aware of the insurable interest requirement. But certainly not aware that converting a policy from one form to another would require a new insurable interest requirement. But Wilmington Trust knew about the multiple things, including that the policy refers to the permanent policy multiple times as a new policy, that the conversion application requested the cancellation of the previous policy and the reissuing of it in lieu of a permanent policy, and that there's an integration clause in the new permanent policy that does not include the term policy. It includes amendments, supplements, the contract itself, and the application. So Wilmington Trust knew all of those things. But they nonetheless concluded that they would just have the continuation of the term policy, the effective date would be 2004, and they didn't have to worry about the insurable interest. Yes, but so what Wilmington Trust knew, and again, security is intermediary for a real beneficial owner, but what they knew is they have the contractual right to exercise or convert this policy from one form to another. The integration clause integrates the conversion endorsement that's part of the second policy, so to speak. So can parties contract to do something illegal? Absolutely not. So they have a right, there's a conversion right within the policy, which could have been fully executed by the original insured, or by, say, a business partner who had an interest in his life, or a family member, or somebody else who had an insurable interest. So it's not as if that's a, you know, just a false or misleading provision in the contract. The contract provision exists and could have been executed, but it just can't be executed in an illegal way. You agree with that? I agree with that 100%. What I, our argument is simply this is not an illegal contractual right, because, and I think the question was asked, you know, is there some guidance and statutes and court decisions? The question of insurable interest is a question that is relevant only at the time the insurance takes effect. And that's, you know, it's part of insurance code section 10110.1F that says insurable interest shall be required to exist at the time the contract of life or disability insurance becomes effective. Right. So I was asking your friend on the other side, how do we, how does California, how does Delaware, how do they define the effective date? And there have been many, many cases, I would submit there have been no cases that have addressed the question of whether an insurable interest is required at the time of conversion, but many cases that hold that a converted policy that is, that exists by virtue of a contractual right of conversion, as this policy was, is a continuation of the original policy. And that is very relevant in the context of this case for the question of insurable interest. Because it does look back to when was this insurance effective or when was it procured and when did it come into its existence? And the insurance is $3.7 million on Mr. Mogadam's life. That's what insurable interest is concerned about, is somebody placing a wager, in other words, putting $3.7 million bet that Mr. Mogadam will die at some point in time where there was none. Right. And I don't think anybody's disputing that. I think as Judge Smith said, that's sort of the boogeyman. Everybody acknowledges the insurable interest issue, but it seems to me anyway that the real issue, the crux of this, is what is the effective date of the permanent policy? If it's 2004, then Wilmington Trust cannot convert this into a permanent policy because it, excuse me, if it's 2004, then they could because there was an insurable interest in 2004. If it's 2023, they cannot because there is no insurable interest in 2023 for Wilmington Trust. Well, I'm not sure we need to be so rigid or formalistic about the concept of the effective date. I think the effective date is the insurance, is when did $3.7 million of life insurance get taken out on Mr. Mogadam's life? And that was clearly 2004 under the original policy. I'm sorry, but that strikes me as a fallacious argument because he took out a policy of life insurance for a term. He could have canceled it at any time. It also was going to expire by its own term. So this is a different policy. You can see that at least it's different, even though you want to say it's effective as of 2004, that can be issued regardless of his health without any further exams. It doesn't have a termination date and the premiums can go up and the amount of insurance coverage can go up, right? So, I mean, it's different from this term policy that was originated in 2004. Right, but almost... I'll follow out from what my colleague has just asked you and just say, let's say you are a member of this court and you've been asked to draft a decision. In your mind, what would that correct decision say in this case? It would say, Your Honor, that an insurable interest is required only at the time that the policy took effect. This policy or the converted policy for insurable interest purposes is a converted policy and is effective at the time that it was originally issued under its original form. It's a continuation of that policy. It does not present a new insurable interest issue at the time of conversion because no new insurance is being created. But the policy language repeatedly refers to a new policy. It has a new integration clause. So how do we deal with that? A couple of things. So first, it does say a new policy, but it also says it will be converted into a new policy, which is really just the change in form of the policy, not like, hey, look, this will be a totally new... There's no new underwriting. Your Honor asked a very good question about what application is referenced. The whole insured, the medical condition that carries with the risk class that this new policy uses all came from the original underwriting in 2004. Your friend said that the application was the document, the form document to apply for the permanent policy and convert the term policy. Are you suggesting that the integration clause in the permanent policy, which says that these things are part of this policy and it lists the application, means the original application from 2004, that the insured filled out with his health questionnaire and exam and all of that? And how do we reach that? What defines it so that we have to conclude it's not the application to convert, it's indeed this 20-year-old application? It's absolutely no different from the decision in Aetna, the U.S. agreement. I'm asking you about these contracts because the parties seemed, I think you're both guilty of this, cherry-picking the best language for the result that you want, which is your jobs as advocates. But what is there in these policies that would lead us to conclude that, no, indeed, we're not talking about the application to convert. We're talking about a 20-year-old application that had the insured's health questionnaire, which is no longer relevant because the whole point of the permanent policies, you don't have to be insurable. Let me just say that the second policy, so to speak, does not exist in a vacuum without the first policy, without question. And if we look at the conversion endorsement at ER 114, it exists in a vacuum to some degree, but you're cherry-picking parts of it that you're going to let stay and parts that go, right? I'm not cherry-picking it. Sure, Gary, you're cherry-picking and ignoring the word new, ignoring the word cancel, ignoring in lieu of. I'm only saying that those words are used in order to reflect the administrative process of changing the policy from one to another and not a substantively, like, you know, somehow coverage under this policy had terminated and Wilmington Trust is applying for a wholly new policy. The elements of the original policy, including the insured's risk class, which is very important to the rates, came from the original underwriting. No new policy, when it is issued anew, is done without underwriting, but this policy is done without underwriting by law because it's part of a conversion right that is covered by law, a contractual conversion right. Let me ask you, and I'm usually one for hypotheticals and so may go off the rails and be nothing that helps us, but suppose a person leases a vehicle and to lease a vehicle, they have to have a check on their credit, they have an application process, a contract, and they have a lease, but there's a provision in there that says, by the way, at the end of the lease in three years, if you then want to buy this vehicle, you can do so without a credit check and we will just convert this to a new contract and you will make different payments and you'll buy the vehicle. Is that one continuing contract or are there two contracts here? I think that is a hard hypothetical to answer because I also think that the, I think the context is very important because the public policy that we're talking about is insurable interest and the concern about insurable interest is did somebody put out 3.7 million dollars of insurance on Mr. Mogadem's life without sort of insurable interest? And the answer is no. Mr. Mogadem took out that policy on his own life. It had contractual rights. Those rights included. He's not continuing. He didn't convert the policy. If he had, all fair. There would be no harm, no foul. He could have easily, Wilmington Trust could have worked with him, convert the policy and then we will purchase it. They are a sophisticated entity that does this and knows about the insurable interest problem, but they didn't. And so now you're saying that this is the same contract that was issued that had a termination date and was going to end. Yes, but I would submit that no one thought there was an insurable interest problem because the contractual right to convert the policy, it adheres in the contract. California law specifically says you have the right to assign all your rights in the contract. But does California law say you have the right to convert the contract in an illegal way? So as I ask your friend, if his business partner was doing this, if his wife, a family member, somebody with an insurable interest was converting the contract, they could do so. It's not like the conversion provision is illusory. It can be executed. It just cannot be executed in violation of the law, correct? Correct. But again, I think the question is, does the law require an insurable interest at the time of the conversion, which turns essentially on whether we should look at the time the policy was originally issued. I agree with you completely. That's why I was asking your friend and I'm asking you, what gets us to decide what is the effective date? Because if it's 2004, you're good. If it's 2023, you're not. Okay, I would say if the second contract did not carry over with it any of the elements of the first contract, then you have a new contract. But in this particular case, you have a policy that recognizes the prior issuance. And again, I go to ER 114 that says very clearly, just as virtually language used out of the Aetna case, this policy is issued pursuant to a conversion or exchange of a policy. It's pursuant to, it's dependent upon the prior existence, the underwriting, the risk class, the rates, the things that matter in this policy. No insurance company issues a life insurance policy without underwriting, unless they have a contractual obligation that preexisted under the original contract to do so. In addition, that same endorsement writer that is part of this second policy is part of the integration clause. So this is integrated into the second clause. It also says the suicide exclusion- Wait, wait, wait, I'm sorry. Could you say that again? What was integrated? Because I've read the integration clause and I didn't see what you're talking about. The integration of the second policy would integrate ER 114, which is the conversion endorsement that specifically says- But it doesn't say that. There's nowhere in the integration clause where it says that this new permanent policy includes the previous policy. Well, the language that I want to read for you doesn't specifically say that, but what it does say is that we are taking dates from the original policy. And that has been decisive or conclusive in the line of cases that say these are continuations. Tell me, because I haven't had a chance to ask a single question so far, but I'm curious about how the suicide exclusion and incontestability provisions of the first policy link with the second policy. Exactly, Your Honor, in this- Explain it. I will say it. So the dates that run for those clauses run from the original- Run from 2004. From 2004. So why do those dates run from 2004? Because this policy was effective. This conversion policy became effective. Converted policy became effective at that time. And so for those clauses to trigger from the original date, they look back to that original date. And that's why, from an insurable interest perspective too, we can look back at that date. We also can- So it doesn't- So if the insured were to commit suicide in 2023, the insurance company would still have to pay out. It would, Your Honor. Even though the original contract had a two-year- You're contesting our two-year suicide provision. That's correct. We would look back to the original date. And that factor, those facts, and those dates become relevant in the question of this continuation issue. And in fact, whether Aetna is pre-ERI or not pre-ERI, the reasoning itself is highly relevant here. Because what the court was saying in that case was what law do we apply to a policy when it's converted? And it said, look, this transaction, the making of this contract, of it becoming effective, of the insurance becoming effective, happened before the insured converted the policy. We've got to look at when the original policy and where the original policy was made in order to determine what law applies. By the same token, if we apply that reasoning here, you look at when that original contract was made as to whether insurable interest existed, not at the time of conversion. And again, I think that advances all of the regular public policies that we care about. Because beyond Wilmington Trust sophistication is really the right of Mr. Mogadam to realize the full value of his policy. And that came from the U.S. Supreme Court decision, Grigsby versus Russell. But he did, right? He had his term policy and he sold it. But he could not have sold it for nearly its value if it did not have the right of conversion. And what the Grigsby case said, U.S. Supreme Court Judge Holmes said is, look, we have to get- He could have converted it before selling it. I mean, all of these things can be addressed. I would think that is formed over substance. Because again, the right to convert in here is one of the many rights that the owner has. But he didn't own it at that point, is the problem. Transferred it. And California law says you have the right to transfer a policy and the transferee has all of the rights, receives all of the benefits and may recover anything that the original person could recover because that protects the value of the policy to that original owner. If we were to say, hey, you can only exercise all of these rights except conversion rights. One of the most valuable rights as explicitly marketed by the insurance company here, as many do, is the conversion right. Sure. But I mean, this sort of begs the question because he transfers it. He could have transferred it to his wife and they could have maintained it as a term policy and it would have expired. Or she could have converted it, right? There's all sorts of ways that after a transfer, the conversion provision could have been exercised. But the problem is that it was canceled and reissued as a new policy and the person who's attempting to exercise the conversion doesn't have an insurable interest. I suspect if we have the technology to convert without canceling and doing all these things, we would do it. The cancellation and issuance is just an administrative step. You cannot convert without changing the paper and issuing the policy. I ask you to turn back to the two clauses about the suicide and how it's dated. Aren't those specific terms in the permanent policy? I mean, that are included in the permanent policy. So we're not looking back to the previous policy to incorporate those? They're part of both. You cannot measure them without looking back to the original policy. So it doesn't even say a new date. It says to run from date of issue of the converted or exchanged coverage. It very much says... Sure, so it included as a term. The new policy had a term that included that date. It incorporated the original. And from that, you think we should say that the entire policy continues and it's one happy policy? Again, I think all of these questions become context sensitive, but for purposes of insurable interest, 100% believe that that is the case here because the insurance itself, the risk that was covered, the risk that was created was something Mr. Mogadam himself procured with a bundle of rights that included the right to convert the policy and the right to sell it to anybody, including without insurable interest. The policy itself says the owner has all of those rights. So does California law. So there's nothing here that defies or violates the insurable interest requirements or the rights of Mr. Mogadam and his reasonable expectations about what that right was and that it was transferable. And I would rest now, but if the court has any further questions, I would be happy to answer. I'll end on the concept of one happy policy, maybe. Pardon me? My colleague mentioned the term one happy policy, so we'll settle with that. Yes, exactly. But I will agree with your honor that to the extent this policy has its ambiguities by using terms like new policy and conversion in the same sentence or in the same application, just as the district court found, that burden and the consequence of that should fall upon the insurance company in evaluating the expectations of the parties. Thank you very much. Thank you, counsel. Okay. Do you have, I can give you a minute for rebuttal if you want it. Very quickly then, thank you.  I would just point out with regard to the page 114 in the record that my friend was talking about, which is the conversion endorsement with the carve out for the suicide and incontestability clause. That is, in my view, that augurs in favor of finding these are two distinct contracts. Those are the only specific instances in the new policy, the 2024 policy, that point back to the old policy. And there's fundamental fairness reasons for that. It wouldn't be right for Mr. Mahogany to have converted the policy in his own life and then the insurance company challenged the policy for misrepresentation that had happened back in 2004 or then if he would have committed suicide to challenge that. That's why those are the only two limited carve outs. And when those are the only two limited carve outs, I just think as a matter of general contract interpretation, those are the only carve outs. Those are the only parts of this new policy that would look back to the old policy and its original effective date. So I think it's very clear these are two different contracts. Just because there is that mention of the old policy is no different than converting your leased car into a purchased vehicle. Almost certainly the second contract when you go to purchase it is going to mention the first. It's going to say in a whereas clause or someplace else, hey, we've had this lease agreement. Guess what? We're canceling that lease agreement and this is a new contract. Simply by mentioning the old contract or with an exception or two using something from the old contract in the new contract doesn't mean these aren't two separate contracts. In fact, they are. The effective date of the 2024 policy is in fact 2024. Counsel, let me ask you then what I asked your friend. If you were in our position, how would you rule? What would your specific ruling be? My specific ruling, Your Honor, would be that these are two separate and distinct contracts that when Wilmington Trust applied for this new policy in 2023 and that was issued to it in 2024, it needed to have had an insurable interest to get out a new contract of insurance on Mr. Moghadam's life and because it didn't have that insurable interest, the new policy is void and we will reinstate the term policy. To be clear, the term policy doesn't itself expire. The 20-year set term where I think the premiums were $7,000 a year, that does expire, but the policy continues, I think, until he turns 100 years old. It's just that the premium charges go up. They can continue to have the coverage under that old policy. They'll just have to pay more for it. All right. Thank you, Counsel. Emeritus Life Insurance Company v. Wilmington Trust is submitted and this session of the court is adjourned for today.
judges: WARDLAW, SMITH, BADE